<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RTI RESTORATION TECHNOLOGIES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, <br><br> Defendant. | Civil Action No. 22-02364 <br><br> **OPINION** <br><br> September 5, 2024 |

**SEMPER**, District Judge.

The current matter comes before the Court on (1) Plaintiffs' Industrial Maintenance Industries LLC ("IMI") and RTI Restoration Technologies, Inc.'s ("RTI") (together "Plaintiffs") motion for summary judgment (ECF 46, "Plaintiffs' MSJ"); and (2) Defendant International Painters and Allied Trades Industry Pension Fund's ("Defendant" or the "Fund") motion for summary judgment. (ECF 48, "Def. MSJ.") The Court has decided this motion upon the submissions of the parties, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 78.1. For the reasons stated below, Plaintiffs' motion for summary judgment (ECF 46) is **GRANTED in part and DENIED in part** and Defendant's motion for summary judgment (ECF 48) is **DENIED**.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

---

[1] The facts and procedural history are drawn from the Complaint (ECF 1, "Compl."), Plaintiffs' motion for summary judgment (ECF 46, "Pl. MSJ"), Defendant's opposition and summary judgment motion (ECF 50, "Def. Opp."; ECF 48, Def. MSJ), Plaintiffs' opposition, (ECF 51, "Pl. Opp."), and the parties' submissions regarding material facts (ECF 46-2, Plaintiffs' Statement of Material Facts "PSOMF"; ECF 48-2, Defendant's Statement of Undisputed Material Facts "DSOMF"; ECF 50-1, Defendant's Responsive Statement of Material Facts "DRSOMF";

Plaintiffs and Defendant each move for summary judgment. (*See* ECF 46, 48.) Plaintiffs seek entry of Declaratory Judgment and dismissal of Defendant's Counterclaim, generally asserting they are not responsible for Coating Technologies Corp.'s ("CTC") withdrawal liability owed to the fund as they are not alter egos, successors, single employers or under common control with CTC. (*See generally* ECF 46-1, Pl. MSJ.) In the alternative, Plaintiffs contend that that the doctrine of laches is applicable to their withdrawal liability claims. (*Id.* at 22.) Specifically, Plaintiffs argue that the Fund's 8-year delay in notifying RTI/IMI of CTC's withdrawal liability is "inexcusable," and that RTI/IMI are prejudiced due to the fund's 8-year delay. Conversely, Defendant moves for summary judgment claiming that Plaintiffs constitute successor entities liable for CTC's withdrawal liability owed to the fund. (ECF 48-1, Def. MSJ. at 15.)

CTC was a painting and wall-covering company created by Robert Gagliano ("Gagliano") and his partner, Manual Caamano. (ECF 48-1, Def. MSJ. at 4; ECF 48-2, DSOMF ¶ 1.) CTC was incorporated in New York in 1998 and later, in New Jersey, in 2000. (*Id.* ¶ 2.) The number of painters CTC employed fluctuated depending on the volume of work; the various painting jobs procured by CTC were based on bids for work with contractors. (ECF 48-1, Def. MSJ. at 5-6.) Like the company, the office building out of which CTC operated was also owned by Robert Gagliano and Manuel Caamano through an entity known as 120 Ridge Street Properties, Inc. (ECF 46-2, Pl. SOMF. ¶ 3.) Starting in about 1998, CTC was signatory to a collective bargaining agreement ("CBA") with the International Union of Painters and Allied Trades, District Council 711 (the "Union"). (*Id.* ¶ 4; Pl. Ex. J. at 6, ¶ 15.) As a result, CTC was required to, and did, make certain benefit contributions to Defendant until early 2013. (ECF 66-2, Pl. SOMF ¶ 5.) Throughout its history, CTC worked for a variety of clients including Pfizer, Turner Construction, Rutgers,

---

ECF 51-1, Plaintiffs' Responsive Statement of Material Facts "PRSOMF"), and documents integral to or relied upon by the Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

and Atlantic Realty Development. (ECF 48-1, Def. MSJ. at 6.) Near the beginning of 2013, CTC ceased operating and went out of business. (ECF 46-2, Pl. SOMF. ¶ 8.)

In 2011, Eric Sobel ("Sobel") formed RTI and has remained President of the company since its inception. (*Id*. ¶¶ 15, 18.) RTI's operations consist of exterior restoration and maintenance of commercial and industrial structures, which includes waterproofing; masonry, stone, metal and glass restoration and preservation; caulking; and facade maintenance. (*Id*. ¶ 16.) Upon its formation, RTI was owned by Eric Sobel (33.333%), Eric Sobel's mother Frema Sobel (33.333%) and Lori Gagliano (33.333%). (*Id*. ¶ 17.) Sobel's father, Ivan Sobel, was close personal friends with Robert Gagliano and when RTI was formed, Ivan Sobel spoke with Gagliano as to whether Sobel could utilize space at CTC's offices at 120 Ridge Street in Newark, New Jersey. (*Id*. ¶¶ 20-21.) Gagliano agreed and allowed Sobel to use a spare room at the 120 Ridge Street building. (*Id*. ¶ 22.) In 2015, two years after CTC went out of business, RTI's workforce increased from five (5) to six (6) employees, and Robert Gagliano became an employee and part owner of the company. (*Id*. ¶ 48.) Consequently, in 2015, the ownership structure in RTI changed to Eric Sobel (40%), Eric Sobel's mother Frema Sobel (20%) and Robert Gagliano (40%). (*Id*. ¶ 49.)

After forming RTI and wanting to expand his business and opportunities, Sobel sought to start an industrial painting and coatings business. (*Id*. ¶ 34.) RTI was not set up to perform work as a painting and coating contractor, so in 2013, Eric Sobel formed IMI, which provides interior and exterior commercial/industrial painting; wall coverings; floor and wall coatings; fabric wrapped panels, and maintenance services. (*Id*. ¶ 35.) Upon its formation in 2013, IMI was owned by Eric Sobel (49%) and his wife Melissa (51%), with most of the company's sales efforts to obtain business being performed by Sobel. (*Id*. ¶ 36.) Sobel has been the Managing Partner of IMI since its inception and in 2013 Sobel moved RTI and IMI's offices to 843 King Georges Road in Fords,

New Jersey, where it remains today as a tenant paying rent. (*Id*. ¶¶ 40-41.) In 2015 IMI's workforce increased and Robert Gagliano became an employee and part owner of IMI and the ownership structure of IMI changed to Eric Sobel (40%), Robert Gagliano (40%) and Frema Sobel (20%) (*Id*. ¶¶ 50, 52.)

As an employee and part owner of RTI and IMI, Robert Gagliano's duties and responsibilities consisted primarily of estimating, sales and managing business relationships. (*Id.* ¶ 53.) For a number of years, from at least January 2016 to the summer of 2022, the RTI-IMI website stated: "RTI was founded in 2011 by partners Eric Sobel and Rob Gagliano combine their expertise and extensive network to create a restoration and specialty coating company." (ECF 48-2, DSOMF ¶ 80.) The website www.rti-imi.com similarly stated that the companies were: "Founded by Eric Sobel and Rob Gagliano." (*Id*. ¶ 81.) In 2018, Robert Gagliano died and both RTI and IMI's ownership structure changed to Eric Sobel (66.667%) and Frema Sobel (33.333%). (*Id*. ¶¶ 54-55.) In 2021, the Fund concluded that CTC owed "withdrawal liability" and assessed RTI and IMI with that liability. (*Id*. ¶¶ 97-98.)

Plaintiffs filed the initial Complaint on April 25, 2022. (ECF 1.) Plaintiffs filed its motion for summary judgment against Defendant on December 18, 2023. (ECF 46.) Defendant similarly filed its motion for summary judgment against Plaintiffs on December 18, 2023. (ECF 48.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most

favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the

5

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

### III. ANALYSIS

Plaintiffs argue that RTI and IMI are not responsible for CTC's withdrawal liability and as a result summary judgment should be entered in Plaintiffs' favor granting them declaratory judgment and dismissing the Fund's Counterclaim. (See generally ECF 46-1. Pl. MSJ.) Conversely, Defendant's contend Plaintiffs are successors to CTC and they must pay the assessed withdrawal liability. (See generally ECF 48-1, Def. MSJ.) Defendant contends that the "fundamental issue" is whether RTI and IMI constitute successors to CTC and are liable for CTC's obligation to the Fund. If so, Defendant argues this necessitates a judgment in favor of the Fund both in the declaratory judgment action and on the Fund's counterclaims. (*Id*. at 4.)

#### a. Withdrawal Liability

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), requires employers who withdraw from underfunded multiemployer pension plans to pay a "withdrawal liability." Withdrawal liability is a statutorily created liability wherein an employer is responsible for its allocable share of unfunded vested benefits after withdrawing from a plan. 29 U.S.C. §§ 1381(b), 1391(a). "An employer may discharge that obligation by making a series of periodic payments according to a post withdrawal schedule set by the pension fund's trustees, or it may prepay the entire debt at any time." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California*, 522 U.S. 192, 195 (1997).

The procedure imposed by the MPPAA is as follows. When an employer withdraws from a pension plan, the trustees must determine the amount of withdrawal liability owed. *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1047 (D.N.J.

1993); 29 U.S.C. §§ 1381, 1382(1). Then the trustees must notify the employers of the amount of and schedule for withdrawal liability, and demand payment in accordance with that schedule. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. §§ 1382(2), 1399(b)(1). The MPPAA then provides the employer with ninety days from the receipt of notice to request a review of the liability assessed by the trustees, identify any inaccuracies, and furnish any additional relevant information. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. § 1399(b)(2)(A). Either party may initiate arbitration proceedings if they cannot agree on the amount of withdrawal liability owed. *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. § 1401(a)(1). However, if the employer fails to pursue arbitration, then "the withdrawal liability assessment becomes due and owing and the trustees may commence an action to collect the unpaid withdrawal liability from the employer." *Gotham Fuel Corp.*, 860 F. Supp. at 1047; 29 U.S.C. §§ 1401(b)(1), 1451. "An employer will waive its statutory rights to dispute aspects of the Fund's liability determination where arbitration is not demanded within the time period prescribed by the statute." *Bd. of Trustees of Trucking Employees of N.J. Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 295 n.5 (3d Cir. 2004) (citing *IUE AFL-CIO Pension Fund v. Barker & Williamson,* 788 F.2d 118, 129 (3d Cir. 1986)).

Further, 29 U.S.C. § 1451(b) provides that the failure to make a withdrawal liability payment is to be treated as a delinquent contribution within the meaning of 29 U.S.C. § 1145. *United Retail & Wholesale Emps. Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 134 (3d Cir.1986), *aff'd*, 481 U.S. 735, (1987). Thus, Plaintiffs' action to recover withdrawal liability is treated as an action brought under Section 1145. Section 1132(g) provides that in any action brought by a pension plan to enforce Section 1145 in which a judgment is awarded in favor of the plan, the court must award interest on the unpaid contributions, reasonable attorneys' fees and costs, and the greater of either 20% of the unpaid contributions or

an amount equal to the accrued interest. 29 U.S.C. § 1132(g). Such an award is mandatory. *See Yahn*, 787 F.2d at 134 ("§ 1132 made attorney's fees, costs and liquidated damages mandatory upon a judgment in favor of a pension plan"); *see also Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1053 (D.N.J. 1993) (stating that "[a]n action to recover withdrawal liability is treated in the same matter as a delinquent contribution matter"). "Unpaid contributions, interest, and liquidated damages generally are considered 'sums certain' pursuant to the calculations mandated in ERISA and the parties' contractual agreements." *Trs. of the Teamsters Pension Tr. Fund of Phila. & Vicinity v. Riccelli Premium Produce, Inc.*, No. 10-3000, 2011 WL 1114175, at *4 (D.N.J. Mar. 23, 2011). "However, the reasonableness of the requested attorney's fees and costs is a matter that requires the Court to exercise discretion." *Id*.

Here, CTC was a signatory to a collective bargaining agreement with the International Union of Painters and Allied Trades, District Council 711 (the "Union"), thereby requiring it to make contributions to the Fund. (ECF 46-1, Pl. MSJ. at 5.) CTC stopped making contributions to the Fund in or about 2013. (ECF 48-1, Def. MSJ. at 10-11.) In or around 2014 CTC was no longer in existence and there was no entity to dispute whether CTC actually withdrew from the pension fund and/or the amount of the assessment because any such dispute would have to be brought by CTC through initiation of arbitration. (ECF 46-1, Pl. MSJ. at 1.) As a result, the Fund was unable to collect the purported withdrawal liability from CTC and assessed the $800,445.00 withdrawal liability against RTI and IMI under theories of alter ego, successor, and single employer. (*Id.* at 2.) RTI and IMI were not and have never been signatories to a CBA with the Union; and RTI and IMI have never been a contributing employer in a multiemployer pension plan established by the Fund.

8

(*Id*. at 5-6). Therefore, the Court's analysis is premised upon common law theories of alter ego, successor and/or common control.[2]

### b. Common Control Theory

Pursuant to the MMPPA, "when a contributing employer withdraws from participation in a fund, the employer is responsible for [its] pro rata share of the unfunded vested liability remaining in the fund at the time of withdrawal, subject to certain adjustments." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 498 (3d Cir. 1992) (citing 29 U.S.C. § 1381(b)). Any businesses "under common control" of a contributing employer are also liable when an employer withdraws from a fund. *Id.* (citing 29 U.S.C. § 1301(b)(1)). While the statute itself does not define specifically "under common control," it "adds that regulations implementing this provision 'shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c)'" of the Internal Revenue Code. *United Food & Commercial Workers Union v. Progressive Supermarkets*, 644 F. Supp. 633, 637 (D.N.J. 1986) (quoting 29 U.S.C. § 1301(b)(1)).

When enacting the common control theory, Congress sought to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities. *See Brown v. Astro Holdings*, 385 F.Supp.2d 519, 530 (E.D. Pa. 2005). To extend withdrawal liability to other entities, one must show that the entity is (1) a trade or business; and (2) under common control with the withdrawing employer. *N.J. Building Laborers' Statewide Pension Fund and Trustees Thereof v. Richard A. Pulaski Constr.*, 322 F. Supp. 3d 546, 557 (D.N.J. 2018); *see also*

---

[2] The Fund moved for summary judgment, asking the Court to find that the Plaintiffs are liable for CTC's withdrawal liability. (ECF 48.) Although, in its Counterclaim, the Fund asserted three theories of liability (common control, successor, and alter ego), it moved for summary judgment on only one of those theories, namely, that the Plaintiffs constitute successors to CTC. Conversely, Plaintiffs have moved for summary judgment as to all theories asserted in the Counterclaim. (ECF 46.) In its opposition papers, the Fund withdrew its claim that the Plaintiffs were under "common control" with CTC. (ECF 50, Def. Opp. at 1-2.)

*Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc.*, 765 F.Supp.2d 710, 714-15 (E.D. Pa. 2011). To prove factor one, courts have relied on the tax law (IRS) definition of trade or business. *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987).[3]

By letter dated July 7, 2021, the Fund noticed RTI/IMI that CTC had withdrawn from the pension fund back in 2013 and claiming that because RTI/IMI were under common control with CTC, RTI and IMI were responsible for CTC's withdrawal liability in the amount of $800,445.00. (ECF 48-2, Def. SOMF. ¶ 85.) Typically, the Court engages in a substantive analysis based upon the aforementioned legal framework. However, here, the Fund has "withdraw[n] its claim that the Plaintiffs were under 'common control' with CT[C]" (ECF 50, Def. Opp. at 1-2.)

Therefore, Plaintiffs' motion for summary judgment as to the common control issue is **GRANTED**.[4]

### c. Single Employer Theory

Plaintiff further seeks summary judgment on the issue of whether RTI/IMI and CTC operated as a single integrated enterprise under a single employer theory. "[T]he 'integrated enterprise' test for the presence of a single employer [is] a sort of labor-specific veil-piercing test" which potentially allows two entities to be treated as a single "employer." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). In determining whether the entities are a "single

---

[3] In *Groetzinger*, the Court explained that to be engaged in a trade or business one "must be involved in [an] activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Id.* In reviewing trade or businesses, courts have added an additional inquiry: "whether characterizing an entity as a 'trade or business' will fulfill the underlying purpose of the MPPAA: to prevent employers from avoiding withdrawal liability by fractionalizing their operations." *Gov't Dev. Bank*, 765 F.Supp.2d at 715.

[4] Although the Court declines to conduct a more fulsome analysis of common control based upon Defendant's withdrawal of the claim the Court notes that it is unlikely that Defendant would be able to show RTI/IMI were under common control with CTC through the requisite "brother-sister controlled group" pursuant to 26 U.S.C. § 1563(a)(2). Based upon the record evidence, it is undisputed that Robert Gagliano (the only common owner), did not own 80% in RTI or IMI, and therefore it is likely that no brother-sister control group can be established in the first part of the test. (Pl. MSJ. at 20-21.) Furthermore, Gagliano did not have more than 50% ownership in either company, therefore, the second part of the brother-sister control group test also likely cannot be established.

integrated enterprise," the court considers "four labor-related characteristics of affiliated corporations: interrelation of operations; common management; centralized control of labor relations; and common ownership or financial control." *Id.* at 486. "No single factor is dispositive; rather, single employer status under this test 'ultimately depends on all the circumstances of the case.'" *Id.* (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). "[T]he application of [the *Pearson*] factors is a 'factual' question rather than a 'legal' one." *Id.* at 496-97. Indeed "[t]he heart of the inquiry is whether separate corporations are 'in truth . . . but divisions or departments of a single enterprise' lacking the 'arm's length relationship found among unintegrated companies.'" *Board of Trustees of the Trucking Employees of North Jersey Welfare Fund, Inc. v. 160 East 22nd Realty, LLC*, No. 15-889, 2016 WL 4582046, *8 (D.N.J. Sept. 2, 2016) (internal quotation omitted).

Here, the evidence creates a dispute of material fact as to whether RTI/IMI and CTC may be treated as a "single integrated enterprise." Indeed, the undisputed record clearly shows that there was at least some interrelation of operations as RTI/IMI operated rent free out of CTC's 120 Ridge Street office in 2013. (ECF 46-2, PSOMF ¶¶ 21, 37; ECF 48-1, Def. MSJ at 10.) Defendant contends that at least one RTI employee also used CTC computers and software during this time. (ECF 50-1, DRSOMF ¶ 23.)

There are also disputes of material fact concerning the centralization of labor relations, common management, and common ownership or financial control. While Plaintiff contends in its moving papers that there was "no interchange of employees between RTI/IMI and CTC" (ECF 46-1, Pl. MSJ. at 17-18.), this is belied by the undisputed record evidence that RTI's first employee was Erin Delaney ("Delaney"). (ECF 46-2, PSOMF ¶ 30.) Until 2013, Delaney was a CTC employee who sat in the front room of the CTC offices and "essentially managed the financial

11

aspect of the projects [at CTC]." (ECF 48-1, Def. MSJ. at 5.) Furthermore, RTI was formed in 2013 and at that time the ownership structure consisted of three owners with a 33.333% interest: Sobel, Sobel's mother, and Robert Gagliano's wife, Lori. (ECF 46-2, Pl. SOMF ¶ 17.) It is undisputed that in 2015, RTI's workforce increased from five (5) to six (6) employees, and Robert Gagliano became an employee and part owner of RTI. (ECF 46-2, PSOMF ¶ 48.) Consequently, in 2015 the RTI ownership structure changed from Sobel and Sobel's wife owning 100% of RTI to Sobel and his mother owning 60% of RTI and Gagliano owning the remaining 40% of the Company. (*Id*. ¶¶ 43, 48-49.) Additionally, in 2015, IMI's workforce also increased and Gagliano became an employee and part owner of IMI as well. (*Id*. ¶ 50.) Similarly, the ownership structure for IMI changed from Sobel and Sobel's wife owning 100% of IMI to Sobel and his mother owning 60% of IMI and Gagliano owning the remaining 40% of the Company. (*Id*. ¶¶ 36, 50, 52.) Therefore, as of 2015, Gagliano was a 40% owner of both RTI and IMI. Defendant contends "Gagliano made estimates, handled client relationships, and submitted bids for prospective work, at times identifying himself as President of [sic] Vice President of IMI." (ECF 50, Def. Opp. at 5-6.) While Plaintiff attempts to downplay Gagliano's management and ownership role within RTI and IMI, it is undisputed that Gagliano had a large ownership interest in both RTI and IMI until his death in 2018. There are clearly material facts in dispute regarding the extent of Gagliano's involvement with RTI and IMI under a single employer theory.

       The record evidence creates a dispute of material fact as to whether RTI/IMI and CTC may be treated as a "single integrated enterprise." Thus, summary judgment is denied on this point. *See Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at 255) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all

justifiable inferences are to be drawn in his favor.'"); *see also Kirsch*, 971 F.2d at 1030 (3d Cir. 1992) (noting that "fact-intensive" inquiries are often "inappropriate to decide on summary judgment").

### d. Alter Ego and Successor in Interest Theories

Defendant argues that there are "undisputed facts" demonstrating that RTI and IMI are successors to CTC. (ECF 48-1, Def. MSJ at 18.) Plaintiffs argue that they are not alter egos or successors of CTC because there is no substantial identity of: (1) ownership, management, or supervision; (2) equipment or customers; or (3) operations. (ECF 46-1, Pl. MSJ. at 7-9.) Plaintiffs also argue there is no substantial degree of control between RTI/IMI and CTC and that there was no improper motive for forming RTI and IMI. (*Id*. at 9-15.)

In defining who is an "employer," for purposes of withdrawal liability, courts have imposed liability upon entities that are the alter ego, successor, or member of a controlled group, requiring them to pay the withdrawal liability of the employer who was responsible for remitting contributions to the pension fund. *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1536 (2d Cir. 1989). The burden of proof for establishing alter ego theory "rests with the party attempting to negate the existence of a separate entity." *Trs. Of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003). Alter ego liability must be established by clear and convincing evidence and is "notoriously difficult for plaintiffs to meet." *Id*. at 192; *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making "a mere technical change in the structure or identity of the employing entity . . . without any substantial change in its ownership or management." *NLRB*

13

*v. Hosp. San Rafael, Inc.*, 42 F.3d 45, 51 (1st Cir. 1994) (internal quotation marks and citation omitted).

In applying the alter ego doctrine, one must ask whether the companies have "substantially identical management, business purpose, operation, equipment, customers, and supervision, as well as ownership." *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 146 (3d Cir. 1994). A plaintiff need not establish all these factors to prove alter ego status. *Id*. "[A]n intent to evade [LMRA or ERISA] is an important, but not an essential, factor." *Id*. at 151; *see also Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307-09 (1st Cir. 1998). This test is applied with a degree of flexibility, in light of the general federal policy of piercing the corporate veil when necessary, to protect employee benefits. *Ret. Plan of UNITE HERE Nat. 7 Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010); *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383 (2d Cir. 1989).

Here, when considering the factors discussed above, the Court determines that the evidentiary records before it raise issues of fact as to the identity of ownership between RTI/IMI and CTC. ERISA "require[s] courts to look beyond how the parties label, or structure themselves" and to "look to the substance of the relationships." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund,* 943 F.3d 49, 59 (1st Cir. 2019). Genuine issues of material fact remain as to whether the companies here share "substantially identical management, business purpose, operation, equipment, customers, and supervision, as well as ownership." *See Stardyne, Inc. v. N.L.R.B.*, 41 F.3d 141, 146 (3d Cir. 1994). Plaintiffs fail to establish that there does not exist genuine issues of material fact to support granting their motion for summary judgment. Here, this fact-laden inquiry is better suited for determination at trial, Plaintiffs' motion for summary judgment with respect to alter ego theory of liability is **DENIED**.

Turning to successor liability, the doctrine of successor liability applies where a successor company purchases the assets of a company but does not acquire the seller's liabilities. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). The successorship liability doctrine is invoked where the transfer of the assets undermines federal labor interests, such as failure to pay employee benefits to a union pension fund. *Sullivan v. Dollar Tree*, 623 F.3d 770, 780-81 (9th Cir. 2010). Generally, the doctrine may be applied where, under the totality of the circumstances, "there is a 'substantial continuity' between the enterprises." *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 293 (9th Cir. 1987) (quoting *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987)). As the *Sullivan* Court noted, fairness is a prime consideration in its application. *Sullivan*, 623 F.3d at 782. In determining fairness, courts consider a number of factors:

> (a) whether there has been a substantial continuity of the same business;
> (b) whether the same employer uses the same plant;
> (c) whether the same work force is used;
> (d) whether the same jobs exist under the same working conditions;
> (e) whether the same machinery, and/or equipment is used;
> (f) whether the same supervisors are employed;
> (g) whether the same methods of production are used;
> (h) whether the same product is produced;
> (i) whether the body of customers is the same.
>
> *NLRB v. Jeffries Lithograph*, 752 F.2d 459, 463 (9th Cir. 1985) (citation omitted).

Here again, the Court determines that there are genuine issues of material fact that preclude granting a motion for summary judgment for either Plaintiffs or the Fund. The factual records submitted by the parties reflect the necessity of a greater fact-intensive inquiry best-suited for trial. There exist disputes as to the substantial continuity of the same business, and the overlaps of location, work force, supervisors, methods of production, similarity of customer base, etc. As such, Plaintiffs' motion for summary judgment with respect to this issue is **DENIED** and Defendant's motion for summary judgment is similarly **DENIED**.

### e. Doctrine of Laches as to Defendant's Counterclaim for Withdrawal Liability

Plaintiffs contend that the doctrine of laches is applicable to their withdrawal liability claims. (ECF 46-1, Pl. MSJ. at 22.) Specifically, Plaintiffs argue that the Fund's 8-year delay in notifying RTI/IMI of CTC's withdrawal liability is "inexcusable", and that RTI/IMI are prejudiced due to the fund's 8-year delay. (*Id*. at 24-27.) The Court agrees, but not necessarily based upon the doctrine of laches, instead based upon the Fund's failure to provide notice of its withdrawal liability assessment and demand payment from Plaintiffs "as soon as practicable" following the employer's withdrawal per 29 U.S.C. § 1399(b)(1). As such, the Court determines that Defendant's independent statutory requirement to provide notice "as soon as practicable" under § 1399(b)(1) was not met, rendering the withdrawal liability at issue not recoverable against Plaintiffs. *Allied Painting & Decorating, Inc. v. Intl. Painters and Allied Trades Indus. Pension Fund*, 107 F.4th 190, 199 (3d Cir. 2024).

"As soon as practicable" after an employer's withdrawal from a pension fund, the fund must "notify the employer of" the amount of withdrawal liability and a schedule for liability payments and "demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1). "[A]s soon as practicable" means "reasonable time," and is "not synonymous with 'as soon as possible.'" *Allied*, 107 F.4th at 197 n.16. Here, CTC operated from 1998 until it went out of business in 2013. (ECF 46-2, Pl. SOMF. ¶ 59.) As such, CTC withdrew from the Fund in 2013. (*Id*. ¶ 8.) The Fund, however, waited until July 29, 2021 – more than 8 years later – to notify RTI and IMI that they were being deemed responsible for CTC's withdrawal liability. (*Id*. at ¶¶ 85-86). While Defendant argues that Plaintiffs waived any laches defense by failing to demand arbitration pursuant to 29 U.S.C. § 1401(a) (ECF 50, Def. Opp. at 12.), this argument is unavailing as the Third Circuit has

16

explicitly stated that the "as soon as practicable requirement under § 1399(b)(1) is an independent statutory requirement" that must be met. *Allied*, 107 F.4th at 199.[5]

The Fund argues in its opposition that the 8-year delay in notifying RTI/IMI of CTC's withdrawal liability is excusable because: (1) they wait at least five years before even inquiring into whether a withdrawal occurred; and (2) after waiting five years, it took another three years to make the determination. (ECF 50, Def. Opp. at 15-18.) In considering Defendant's arguments, the Court acknowledges that the "as soon as practicable" language sets no rigid timeframe. *Allied*, 107 F. 4th at 196. Congress's "adoption of a looser 'as soon as practicable' requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment." *Id.* (citing *Bay Area Laundry and Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California, Inc.,* 522 U.S. 192, 205 (1997)).

While the Court acknowledges there is no "rigid timeframe," the context surrounding this case is paramount. Within the five-year period after CTC went out of business and stopped remitting contributions to the Fund (2013-2018), the following occurred: (i) in 2013, the IUPAT Welfare Fund initiated a lawsuit against CTC for unpaid welfare fund contributions (ECF 48-2, Def. SOMF. ¶ 69); and (2) from 2015 through 2017, the International Painters and Allied Trades Union (the "Union") were in repeated contact with RTI and IMI purportedly because of Robert Gagliano's involvement with the companies and CTC's still unpaid delinquent contributions. (ECF

---

[5] In *Allied*, the Third Circuit upheld the district court's decision invalidating the assessment of withdrawal liability but for reasons different than the District Court. Specifically, the Third Circuit rejected the traditional laches analysis and held that that the employer need not demonstrate prejudice to defeat the withdrawal assessment. *Allied*, F.4th at 197-98. Instead, the Court held that the employer need only prove that the plan failed to "notify", "schedule", and "demand payment…as soon as practicable" after the withdrawal in accordance with 29 U.S.C. § 1399(b)(1). *Id.* at 195-96. The Third Circuit noted that the "as soon as practicable" deadline sets no rigid timeframe. *Id.* The Court reasoned that a phrase familiar to the common law, "as soon as practicable" means "reasonable time." *Id.* at 197 fn. 16. Ultimately, the Third Circuit found that the "as soon as practicable" requirement is an independent statutory requirement that must be met for a fund to recover withdrawal liability from an employer. *Id.* at 199.

46-2, Pl. SOMF. ¶¶ 68-78.) Based upon the record evidence, as of 2013, the Fund had all the requisite information available to be aware that CTC withdrew from the Fund and RTI/IMI were operational (with Gagliano's involvement as of 2015). The Fund attempts to downplay its knowledge regarding CTC's withdrawal and cannot logically seek to impute supposed knowledge of CTC's purported withdrawal on RTI/IMI so the Fund can secure a judgment in its favor; yet negate its own knowledge of withdrawal to rescue itself from its inexcusable delay.

Put simply, the *Allied* decision, which dealt with the same lengthy procedure in which it took more than a decade to determine if and when a withdrawal occurs, revealed that IUPAT's prior methods for determining a withdrawal did in fact lead to an inexcusable delay and such a finding was not disputed by any party – including IUPAT. *See Allied*, 107 F.4th at 198. Accordingly, while the *Allied* decision does not alter the law with respect to a laches defense, it did further bolster Plaintiffs' position that the Fund's 8-year delay in determining a withdrawal was not in compliance with the statutory framework.[6] Plaintiffs need not demonstrate prejudice to defeat the assessment. Instead, the *Allied* decision demonstrates that Plaintiffs here need only prove that the Fund failed to comply with the "as soon as practicable" language following CTC's withdrawal. *See* 29 U.S.C. § 1399(b)(1). As a result, the Court finds that this 8-year delay was not reasonable and for the foregoing reasons the delay ran directly contrary to the Fund's statutory obligation pursuant to 29 U.S.C. § 1399(b)(1) and the *Allied* decision.

Based upon the foregoing, the Plaintiff's motion for summary judgment is **GRANTED** and the Fund's Counterclaim for withdrawal liability is **DISMISSED**.

### f. Reasonable Attorney's Fees

---

[6] *Allied*, 107 F.4th at 199 (concluding that no one challenged the Arbitrator's conclusion that the Fund did not act "as soon as practicable" when it provided notice of Allied's withdrawal liability and demanded payment twelve years after Allied's obligation to contribute to the Fund ceased).

The Fund's claim for withdrawal liability is brought pursuant 29 U.S.C. § 1451. *See* 29 U.S.C. § 1451(a)(1), ERISA § 4301(a)(1); *see also* (ECF 46-4, Magnelli Decl., Exhibit J at pp.14-17). For any action brought under this section, "the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." 29 U.S.C. § 1451(e), ERISA § 4301(e). Pursuant to 29 U.S.C. § 1451(e), ERISA § 4301(e), Plaintiffs request for leave to file a motion for attorneys' fees and costs is **GRANTED**.

## IV. CONCLUSION[7]

For the reasons stated above, Plaintiffs' motion for summary judgment (ECF 46) is **GRANTED IN PART AND DENIED IN PART** and Defendant's motion for summary judgment (ECF 48) is **DENIED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: James B. Clark, U.S.M.J.
    Parties

---

[7] To clarify the Court's Opinion, the Court declines to enter a declaratory judgment indicating that RTI/IMI are not: (1) "employers," as such term is defined under 29 U.S.C. § 1301(b)(1), ERISA § 4001(b)(1); (2) a "contributing business" or a business under "common control" with CTC or (3) a successor to, alter ego of, joint or single employer and/or part of controlled group of entities with CTC. However, the Court's decision with respect to the "as soon as practicable" requirement under 29 U.S.C. § 1399(b)(1) is dispositive. Defendant's counterclaim is dismissed and the fund's claim for withdrawal liability against RTI and IMI fails on statutory grounds.